IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

THOMAS FARMER,                :
                                      :
           Plaintiff,           :         CIVIL NO. 4:CV-07-1733
                                        :
        v.                   :         (Judge Jones)
                                        :
UNITED STATES OF AMERICA, *et al.*, :
                                        :
           Defendants.       :

## MEMORANDUM

March 4 , 2009

On September 24, 2007, Plaintiff Thomas Farmer ("Plaintiff" or "Farmer"), a former inmate, initiated this *pro se* civil rights action by filing a Complaint raising *Bivens*[1] claims under 28 U.S.C. § 1331 and the Federal Tort Claims Act ("FTCA"). Presently before the Court is a Motion to Dismiss, or in the Alternative, for Summary Judgment, filed on behalf of Defendants.  (Doc. 17).  For the reasons set forth below, the Motion will be granted.

---

[1]*Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). *Bivens* stands for the proposition that "a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal-question jurisdiction of the district courts to obtain an award of monetary damages against the responsible federal official." *Butz v. Economou*, 438 U.S. 478, 504 (1978).

## I.      BACKGROUND

At the time of filing, Plaintiff was confined at the Federal Correctional Institution - Schuylkill ("FCI-Schuykill") in Minersville, Pennsylvania.  He makes the following allegations in his Complaint: (1) FCI-Schuylkill staff erroneously assigned him to a top bunk, which resulted in him hitting his head on the ceiling and falling from the top bunk on May 27, 2006; (2) staff failed to provide him with adequate medical care after he fell from the top bunk, including proper transportation to an outside hospital; (3) staff failed to provide him with adequate medical care for his sixty pound abdominal hernia; and (4) staff retaliated against him for complaining about the May 27, 2006 incident by filing a false incident report against him.  (*See* Doc. 1 at 6-21).  Named as Defendants are the United States of America, the Federal Bureau of Prisons ("BOP"), and the following employees of FCI-Schuylkill: Ronnie Holt, Warden; Kenton Hubble, Physician Assistant ("PA"); Michael Kabonick, Emergency Medical Technician ("EMT"); Russell Hendershot, M.D., Clinical Director; Tao Chaw, M.D., Clinical Director (retired); Edgardo Ong, Health Services Administrator; Gerardo Talamantes, Correctional Counselor; and Anthony Prantow, Unit Manager.

Service of the Complaint was directed by Order dated October 22, 2007.  (Doc.

10).  Following a request for an extension of time, which was granted (Doc. 15), on

March 28, 2008, Defendants filed the instant Motion to Dismiss, or in the alternative,

for Summary Judgment (Doc. 17).  On April 9, 2008, Defendants filed a Motion for

Leave to exceed the page limitation set forth in Middle District of Pennsylvania Local

Rule 7.8 in their supporting brief (Doc. 18).  By Order dated April 10, 2008 (Doc. 20),

Defendants' Motion was granted.  Following a request for an extension of time to file

their supporting brief, which was granted on April 14, 2008 (Doc. 22), Defendants

filed a Brief (Doc. 23) and Statement of Facts (Doc. 24) on April 21, 2008.  Because

Plaintiff did not file any opposition to the Motion, on May 14, 2008, this Court issued

an Order granting Plaintiff an opportunity to file his opposition to Defendant's Motion

within fifteen (15) days.  (*See* Doc. 25).  He was warned that his failure to do so

would result in the Motion being deemed unopposed and addressed on the merits.

The time period to submit opposition has long expired, and Plaintiff has failed to

oppose the Motion.

## II.   STANDARDS OF REVIEW

### A.   Motion to Dismiss

Defendants seek dismissal of Farmer's Complaint pursuant to Federal Rule of

Civil Procedure 12(b)(6) on the basis that it fails to state a claim upon which relief can

be granted.  In the alternative, Defendants seek summary judgment and have

submitted evidentiary documents outside the pleadings in support of their motion.

Federal Rule of Civil Procedure 12(d) provides:

> **(d) Result of Presenting Matters Outside the Pleadings.**  If, on a
> motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are
> presented to and not excluded by the court, the motion must be treated as
> one for summary judgment under Rule 56.  All parties must be given a
> reasonable opportunity to present all the material that is pertinent to the
> motion.

Fed. R. Civ. P. 12(d).  The Court will not exclude the evidentiary materials

accompanying Defendants' Motion because Farmer was given a reasonable

opportunity to present material relevant to the Motion.  (*See* Doc. 25).  Accordingly,

the Court will treat Defendants' Motion to Dismiss, or in the alternative, for Summary

Judgment, solely as a motion seeking summary judgment.

## B.    Summary Judgment

Summary judgment is appropriate if the record establishes "that there is no

genuine issue as to any material fact and that the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(c).  Initially, the moving party bears the burden of

demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v.

Catrett*, 477 U.S. 317, 323 (1986).  The movant meets this burden by pointing to an

absence of evidence supporting an essential element as to which the non-moving party

4

will bear the burden of proof at trial. *Id.* at 325. Once the moving party meets its burden, the burden then shifts to the non-moving party to show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e)(2). An issue is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a factual dispute is "material" only if it might affect the outcome of the action under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

In opposing summary judgment, the non-moving party "may not rely merely on allegations or denials in its own pleadings; rather, its response must . . . set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985). However, the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the non-moving party. *P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848, 852 (3d Cir. 2006).

Summary judgment should not be granted when there is a disagreement about

the facts or the proper inferences that a factfinder could draw from them.  *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982).  Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of  *material* fact."  *Anderson*, 477 U.S. at 247-48.

Farmer failed to file any opposition to Defendants' Motion for Summary Judgment, and therefore, the Motion is deemed unopposed.  Farmer did not submit any evidence in response to the evidence submitted by Defendants.  Moreover, because Farmer has failed to file a separate statement of material facts controverting the statement filed by Defendants, all material facts set forth in Defendants' Statement of Material Facts (Doc. 24) will be deemed admitted.  *See* M.D. Pa. LR 56.1.[2]  Despite these deficiencies, the Court still must analyze the merits of Defendants' Motion to determine whether summary judgment is appropriate.  *See Lorenzo v. Griffith*, 12 F.3d 23, 28 (3d Cir. 1993); *Anchorage Associates v. Virgin Islands Board of Tax Review*, 922 F.2d 168, 174-75 (3d Cir. 1990).

## III.   DISCUSSION

---

[2]M.D. Pa. LR 56.1 provides, in relevant part, as follows: "All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."

### A.      Undisputed Facts

Defendants' Statement of Material Facts (Doc. 24) and supporting materials[3]

establish the following undisputed facts material to the instant Motion :

### 1.      Facts Relating to Medical History

On December 15, 2003, the BOP held Farmer on holdover status at the United

States Penitentiary in Lewisburg, Pennsylvania ("USP Lewisburg").  (Doc. 24 ¶ 1).

While Farmer was at USP Lewisburg, Paramedic D. McClintock issued him an Idle,

Convalescent and Change in Work Classification Status form ("Convalescent Work

Change form").  (*Id.* ¶ 2).  The form, which had an expiration date of January 15, 2004,

restricted Farmer to a bottom bunk because of his chronic abdominal problem.  (*Id.*).

Generally, after a medical restriction such as a bottom bunk designation is issued to an

inmate, a Health Services staff member loads it into the SENTRY computer program,

enabling staff to access the information by computer.  (*Id.* ¶ 3).  In addition, staff place

a copy of the restriction in the inmate's medical record and provide the inmate with a

copy of it.  (*Id.* ¶ 4).

On December 22, 2003, the BOP designated Farmer to the Schuylkill Federal

---

[3]Defendants submitted Declarations by the following individuals in support of their Motion: Adam J. Ackley (Ex. 1); Tao G. Chaw (Ex. 2); Anthony Prantow (Ex. 3); Michael Kabonick (Ex. 4); Edgardo Ong (Ex. 5); Ronnie R. Holt (Ex. 6); Kenton Hubble (Ex. 7); Russell Hendershot (Ex. 8); and Gerardo Talamantes (Ex. 9).

Prison Camp in Minersville, Pennsylvania ("FPC Schuylkill").  (*Id.* ¶ 5).  After

conducting an initial screening of Farmer, FPC Schuylkill Health Services staff placed

him on restricted duty and assigned him a lower bunk pass.  (*Id.* ¶ 6).  These

restrictions expired on December 22, 2004.  (*Id.*).

Following a medical exam on December 24, 2003, staff noted the following

conditions of Farmer's restricted duty status: no prolonged walking or standing, and no

pushing or pulling anything over fifteen (15) pounds.  (*Id.* ¶ 7).  Staff noted in the

medical report that a medical doctor would evaluate Farmer and that he should be

provided with additional abdominal support.  (*Id.* ¶ 8).  He was provided with elastic

bandages to wrap around his midsection until he could see the medical doctor.  (*Id.*).

On January 14, 2004, Dr. Hendershot evaluated Farmer pursuant to his request

to be placed on medically unassigned status.  (*Id.* ¶ 12).  Farmer informed Dr.

Hendershot that, after suffering from gun shot wounds to his mid-section around 1998,

he had a skin graft to his midsection.  (*Id.* ¶ 13).  As a result, he suffered from an

abdominal hernia.  (*Id.*).  Due to the loss of muscle to his midsection, Farmer said that

his midsection was unable to keep its normal shape, and a protrusion was visible.  (*Id.*

¶ 14).  In addition, Farmer informed Dr. Hendershot that Washington General Hospital

had refused to perform an abdominal hernia repair.  (*Id.*).  Dr. Hendershot determined

that Farmer should become medically unassigned for the next year and provided him

with an abdominal binder[4] to provide additional support for his midsection.  (*Id.* ¶ 15).

Dr. Hendershot also issued Farmer a Convalescent Work Change form indicating that

Farmer was medically unassigned and short line appropriate, meaning that the amount

of time Farmer had to stand in line should be reduced.  (*Id.* ¶ 17).

On March 24, 2004, Dr. Hendershot evaluated Farmer in the Chronic Care

Clinic to follow up on his abdominal hernia.  (*Id.* ¶ 18).  Dr. Hendershot advised

Farmer to wear his abdominal binder twenty-four hours a day, seven days a week.  (*Id.*

¶ 19).  He also gave Farmer fiber tablets, mineral oil, and Maalox to help alleviate his

complained of constipation and abdominal pain.  (*Id.*).  In addition, Dr. Hendershot

issued Farmer a Convalescent Work Change form excusing Farmer from school and

instructing him to sit and lie in the supine position as tolerated.  (*Id.* ¶ 20).

On March 30, 2004, Dr. Steven J. Perlin of HSR Teleradiology Solutions took

and evaluated supine and erect x-rays of Farmer's abdomen.  (*Id.* ¶ 21; Doc 23-10 at

94, 3/30/04 Radiology Report).  The x-rays revealed no dilated loops or small bowel to

suggest an obstruction; an unusual density on the supine study extending from the

upper abdomen into the deep pelvis in the midline having a longitudinal extent of

---

[4]An abdominal binder is a device that wraps around an individual's abdomen and provides compression and support to that area.  (Doc. 24 ¶ 16).

approximately 34 centimeters and transverse dimension of approximately 23 centimeters, which presumably represented a large midline hernia; surgical staples in the midline upper abdomen; and no evidence of mass, organomegaly, or ascites.   (Doc. 24 ¶ 22; Doc. 23-10 at 94).  Dr. Perlin indicated on his report that he believed Farmer suffered from a large midline hernia that it was either an incisional hernia or diastasis recti.  (Doc. 24 ¶ 23; Doc. 23-10 at 94).  The report also indicated that an additional computed tomography (CT) scan of the area would be helpful for further dilineation. (Doc. 24 ¶ 23; Doc. 23-10 at 94).

On June 14, 2004, Dr. Chaw evaluated Farmer to follow-up on his abdominal hernia.  (*Id.* ¶ 24).  Dr. Chaw educated Farmer on his condition and advised him to continue application of his abdominal binder.  (*Id.*).

On June 21, 2004, Dr. Chaw provided Farmer with a second abdominal binder to wear while Farmer's other binder was being cleaned.  (*Id.* ¶ 25).

On July 3, 2004, PA Hubble saw Farmer after he allegedly fell down the stairs. (*Id.* ¶ 26).  Hubble noted no signs of trauma, that Farmer's abdomen was tender, and that Farmer had a small contusion on his thigh.  (*Id.*).  Hubble prescribed Motrin to help alleviate Farmer's pain.  (*Id.*).  On a follow-up visit on July 6, 2004, Dr. Chaw saw Farmer, who reported pain in his right lateral thigh and lower back.  (*Id.* ¶ 27).  Dr.

Chaw noted no bruising or swelling on Farmer's back, and an evaluation of Farmer's right leg revealed some mild tenderness to his right thigh.  (*Id.*).  Dr. Chaw provided Farmer with Motrin and a muscle rub ointment for his back and thigh.  (*Id.* ¶ 28).  He also advised Farmer to apply heat to the area; recommended bed rest; and ordered x-rays of Farmer's spine.  (*Id.*).

On July 8, 2004, an x-ray of Farmer's lumbosacral spine revealed no evidence of acute fracture or spondylolisthesis, some mild degenerative changes seen with osteophytes at L2-3, and smaller osteophytes noted at other levels.  (*Id.* ¶ 29; Doc. 23-10 at 100, 7/8/04 Radiology Report).  The x-ray showed a mild degenerative change, which, in Dr. Hendershot's opinion, would not have rendered Farmer disabled in that he would have been able to function and have a normal life.  (Doc. 23-10 at 100, 30 ¶ 27, Hendershot Decl).

On July 13, 2004, Dr. Chaw saw Farmer for another follow-up after the July 3, 2004 incident, and noted that Farmer's right thigh remained stable and x-rays of his back still were pending.  (Doc. 24 ¶ 31).  Dr. Chaw prescribed additional Motrin and muscle rub ointment and instructed Farmer on how each medication was to be used. (*Id.*).

On July 20, 2004, the BOP transferred Farmer to a Community Confinement

Center (now known as a Residential Reentry Center or "RRC").  (*Id.* ¶ 32).

Farmer was released on parole on September 3, 2004.  (*Id.* ¶ 33).  However, Farmer was re-designated to FPC Schuylkill after violating the conditions of his parole. (*Id.* ¶ 34).  On February 7, 2006, staff cleared Farmer for general population and assigned him a bed in the common area of dormitory number 1.  (*Id.* ¶ 35).  On February 8, 2006, PA Hubble conducted Farmer's Admission and Orientation Physical Examination and noted that Farmer had an abnormal abdomen with a large abdominal hernia caused by a skin graft.  (*Id.* ¶ 36).  Hubble determined that Farmer was cleared for housing in general population, regular duty, and recreation.  (*Id.* ¶ 37).  However, on February 9, 2006, Hubble issued Farmer a Convalescent Work Change form authorizing Farmer to possess the abdominal binder and instructing him to avoid lifting, bending or stooping.  (*Id.* ¶ 38).  The form did not place Farmer on medically unassigned status.

On March 3, 2006, EMT Kabonick issued a Convalescent Work Change form restricting Farmer to a bottom bunk.  (*Id.* ¶ 39; Doc. 23-10 at 107, 3/3/06 Convalescent Work Change form).  The form also placed Farmer on medically unassigned status through March 3, 2007.  (Doc. 23-10 at 107).

On March 9, 2006, Farmer sent an Inmate Request to Staff requesting a copy of

the Convalescent Work Change form showing the restrictions on his activities due to his medical condition, including the restriction on sitting or standing for twenty minutes or more.  (Doc. 24 ¶ 40; Doc. 23-10 at 109, 3/9/06 Inmate Request to Staff). Staff advised Farmer that his request was being processed and to watch the callout to pick up his request.  (Doc. 24 ¶ 41; Doc. 23-10 at 31 ¶ 35).

On March 27, 2006, Health Services staff received an Inmate Request to Staff from Farmer stating that he had severe internal pain above the left side of his abdominal hernia, and he requested to be seen as soon as possible.  (Doc. 24 ¶ 42). That same day, Health Services responded stating that Farmer could come to sick call for any emergency issue, he was assigned to Dr. Chaw, and he would be placed on his list.  (*Id.* ¶ 43).

On March 31, 2006, Dr. Chaw saw Farmer in the Chronic Care Clinic and determined that no medication was necessary, but provided Farmer with another abdominal binder.  (*Id.* ¶ 44).

On April 10, 2006, pursuant to his request on March 9, 2006, Farmer received copies of the Convalescent Work Change forms dated February 9, 2006[5], December 22, 2003, and March 24, 2004.  (*Id.* ¶ 45).

---

[5]Defendants' Statement of Facts states that the form was dated February 6, 2006, but the form itself is dated February 9, 2006.  (*See* Doc. 23-10 at 105, 2/9/06 Work Change Form).

### 2.      Facts Relating to Bed Reassignment

In the beginning of May 2006, Correctional Counselor Talamantes approached

Farmer about moving him from the common area to a cubicle because Unit Team

members had received information from other inmates that Farmer may have been

threatening and harassing other inmates in the common area, where he had been

assigned since his return to FPC Schuylkill.  (*Id.* ¶ 46).  Counselor Talamantes advised

Farmer to attempt to locate another inmate currently housed in a cubicle and attempt to

make arrangements to house together.  (*Id.* ¶ 47).  Later that day, Farmer informed

Talamantes that he had found such an inmate.  (*Id.* ¶ 48).  Counselor Talamantes

advised Farmer that, as soon as a bed opened up in the cubicle, he would reassign him.

(*Id.* ¶ 49).

The bed that Farmer requested became available on May 26, 2006.  (*Id.* ¶ 50).

Counselor Talamantes ran a SENTRY computer generated roster to see if Farmer had

any restrictions that would have prevented him from being reassigned, and the roster

did not reveal that Farmer had a bottom bunk restriction or any other type of issue that

would have prevented him from accepting an upper bunk assignment.  (*Id.* ¶ 51).

Farmer was assigned to Bed 006, upper bunk.  (*Id.* ¶ 52).  Later that day, after

assigning Farmer to Bed 006, upper bunk, Farmer told Talamantes that both he and his

new cellmate had a lower bunk restriction.  (*Id.* ¶ 53).  Talamantes then re-checked the

SENTRY computer generated roster, which again indicated that Farmer had no lower

bunk restriction.  (*Id.* ¶ 54).  However, Talamantes gave Farmer an opportunity to

provide a copy of the lower bunk restriction.  (*Id.* ¶ 55; Doc. 23-11 at 32 ¶ 15,

Talamantes Decl).  Farmer did not provide a copy of a lower bunk restriction, and

therefore, he remained assigned to the upper bunk.  (Doc. 24 ¶ 55).  However,

Talamantes advised Farmer that if he still believed that he required a lower bunk, he

should report to Health Services the next day to straighten out the issue.  (*Id.* ¶ 56).

### 3.    Facts Regarding May 27, 2006 Incident

On May 27, 2006, at approximately 4:00 a.m., Farmer reported to the staff that

he had fallen from his upper bunk.  (*Id.* ¶ 57).  Staff immediately escorted Farmer to

Good Samaritan Regional Medical Center in Pottsville, Pennsylvania ("GSRMC").

(*Id.* ¶ 58).  GSRMC staff noted no visible signs of trauma, and a CT scan showed no

skull fracture.  (*Id.*).  In addition, the visualized portions of the paranasal sinuses and

mastoids were aerated; there was no hemorrhagic extra-axial collection; no

intraparenchymal mass effect, hemorrhage or acute territorial infarct; and no

hydrocephalus.  (*Id.* ¶ 59).  Dr. Nikolas Baran of GSRMC diagnosed Farmer as

suffering from a head contusion (a bruise that occurs after a body part is struck

forcefully causing injury and breaking small capillaries), which was a *minor* head injury in that Farmer was not rendered unconscious or confused.  (*Id.* ¶ 60; Doc. 23-10 at 31-32 ¶ 40, Hendershot Decl).  Dr. Baran issued Farmer after care instructions to apply ice to the area and take Tylenol or Motrin to control the pain.  (Doc. 24 ¶ 60).

On May 28, 2006, EMT Kevin Vincenzes evaluated Farmer and found no physical markings on his head, neck or back.  (*Id.* ¶ 61).  Vincenzes advised Farmer to take ibuprofen and ice the area per the after care instructions provided by GSRMC. (*Id.*).

On May 29, 2006, at approximately 9:00 a.m., Mid Level Practitioner Zabala saw Farmer and noted that Farmer said he had no complaints.  (*Id.* ¶ 62).  She advised Farmer to follow up with Health Services the next day regarding his hypertension and to take over-the-counter medication from the commissary for pain.  (*Id.*).  On that same date, Unit Secretary M. Lucas contacted Health Services staff after Farmer approached her for a form to file an administrative remedy and stated that he had a lower bunk restriction.  (*Id.* ¶ 63).  Zabala then reviewed Farmer's medical record, noted that Farmer should have a lower bunk restriction, and staff loaded the lower bunk restriction into the SENTRY system.  (*Id.* ¶ 64; Doc. 23-11 at 75, SENTRY Report). On May 31, 2006, Health Services staff loaded additional information into the

16

SENTRY system to reflect that the lower bunk restriction was issued on March 3, 2006.  (Doc. 24 ¶ 66; Doc. 23-11 at 75, SENTRY Report).

On May 30, 2006, Zabala saw Farmer during sick call for complaints of dizziness, headaches, vomiting, and loss of concentration.  (Doc. 24 ¶ 65; Doc. 23-10 at 32 ¶ 44, Hendershot Decl).  Zabala noted that Farmer's vitals were normal, observed that Farmer was not wearing his abdominal binder, and referred him to a medical doctor.  (Doc. 24 ¶ 65).

On June 2, 2006, Dr. Hendershot evaluated Farmer for head, back, and numerous other muscular-skeletal complaints.  (*Id.* ¶ 67).  Dr. Hendershot noted that Farmer ambulated with difficulty, x-rays of his back and neck were normal, and he was once again not wearing the abdominal binder that he had been provided.  (*Id.* ¶ 68).  Dr. Hendershot diagnosed Farmer with possible post-concussion syndrome, which is a subjective diagnosis based primarily on the patient's self-reporting.  (*Id.* ¶ 69).  Even though Farmer complained of many problems, he recalled all of the hospital visit and discharge instructions.  (*Id.*).  Dr. Hendershot reissued Farmer another Convalescnet Work Change form restricting him to a bottom bunk and placing him on convalescent status until June 12, 2006.  (*Id.* ¶¶ 70, 72; Doc. 23-11 at 9, 6/2/06 Convalescent Work Change form).  When an inmate is placed on convalescent status,

he is excused from work until the date specified.  (Doc. 24 ¶ 70).   Dr. Hendershot also prescribed Naproxen for the pain.  (*Id*.).   During his visit with Dr. Hendershot, Farmer stated that he would not work and would "go to the hole to add fuel to the fire and sue if he has to."  (*Id.* ¶ 71).

On June 12, 2006, PA Ortiz issued Farmer a Convalescent Work Change form stating that Farmer should continue to be placed in a lower bunk, should not participate in any sports, should limit his standing to fifteen (15) minutes per hour and walking to five (5) minutes, and should not participate in any pushing, pulling, or lifting anything over five (5) pounds.  (*Id.* ¶ 73).  These restrictions were set to expire on July 12, 2007. (*Id*.).

On June 13, 2006, PA Ortiz saw Farmer for complaints of pain in his head whenever he moved his head and blurred vision that he alleged began after he fell out of his bunk.  (*Id.* ¶ 74).  Farmer stated that the pain got worse at night and was relieved when he took pain medication.  (*Id*.).  PA Ortiz noted no irregularities and prescribed Farmer Hydrochlorothiazide and Naproxen.  (*Id.* ¶ 75).

On June 26, 2006, PA Ortiz saw Farmer during the Chronic Care Clinic for complaints of headaches.  (*Id.* ¶ 76).  Ortiz determined that Farmer was suffering from hypertension, migraine headaches, and an abdominal hernia.  (*Id*.).  He instructed

Farmer to continue his medication with the addition of the medication Elavil.  (*Id.*).

On September 29, 2006, PA Hubble saw Farmer for complaints of lower back pain and that his abdominal binder had been confiscated.  (*Id.* ¶ 78).  PA Hubble noted that Farmer was not suffering from any spasms, prescribed him Motrin for sixty (60) days, gave him a new abdominal binder, and issued a Convalescent Work Change form restricting Farmer to a bottom bunk and placing him on medically unassigned status. (*Id.* ¶ 79).  The restrictions were set to expire on March 28, 2007.  (*Id.*).

On October 3, 2006, PA Hubble noted that he would provide Farmer with a smaller binder after he complained that his abdominal binder was too big and did not support his abdominal hernia.  (*Id.* ¶ 80).  At this visit, PA Hubble noted that Farmer stated that he was doing okay and had not had any issues since he was prescribed Elavil.  (*Id.* ¶ 81).  He also noted no change to Farmer's abdominal hernia and that hte hernia was not repairable, and prescribed Hydrochlorothiazide, Naproxen, and Elavil. (*Id.*).

On January 27, 2007, PA Hubble saw Farmer for complaints of continued pain as a result of his abdominal hernia.  (*Id.* ¶ 82).  Hubble increased Farmer's dosage of Elavile and educated Farmer on the use of his abdominal binder.  (*Id.*).

On March 1, 2007, Farmer failed to show for his appointment in the Chronic

19

Care Clinic.  (*Id.* ¶ 83).  On March 19, 2007, prior to the BOP releasing Farmer on a federal writ, PA Hubble completed a Medical Summary of Federal Prisoner/Alien in Transport and noted Farmer's abdominal hernia and hypertension, and his three medications, Naproxen, Elavil, and Hydrochlorothiazide.  (*Id.* ¶ 84).

On April 20, 2007, when Farmer returned to FCI Schuylkill from the federal writ, PA Hubble conducted an intake screening.  (*Id.* ¶ 85).  At that time, Farmer reported that he did not suffer from chronic pain and was not currently taking pain medication.  (*Id.*).  Hubble noted that Farmer was not suffering from an intestinal infection, his chest and skin were clear, he was not coughing up blood nor suffering from a prolonged cough, and was not suffering from any communicable disease.  (*Id.* ¶ 86).  Hubble also determined that Farmer was cleared for Food Services work.  (*Id.* ¶ 87).

On May 1, 2007, Mid Level Practitioner Zabala saw Farmer, provided him with another abdominal binder, approved him for a lower bunk restriction, and issued him a Convalescent Work Change form that restricted Farmer to a lower bunk until May 1, 2008.  (*Id.* ¶ 88).  On May 9, 2007, staff saw Farmer at the Chronic Care Clinic, and he had no complaints.  (*Id.* ¶ 89).

On June 25, 2007, after Farmer allegedly was involved in a fight, EMT

Vincenzes treated Farmer for abrasions to the left forearm, left knuckles, below his nose, and above his left eye, as well as a puncture and lacerations to his lower lip.  (*Id.* ¶ 90).

On August 28, 2007, PA Hubble issued Farmer a Convalescent Work Chagne form restricting Farmer to a bottom bunk.  (*Id.* ¶ 91).  Hubble instructed Farmer to avoid sports; standing or walking for more than fifteen (15) minutes; and pushing, pulling, sweeping, mopping, and lifting anything over five (5) pounds.  (*Id.*).

On September 4, 2007, Farmer complained to PA Hubble that his Elavil was not working as well for his pain and requested surgery to repair his abdominal hernia.  (*Id.* ¶ 92).  It already had been determined that Farmer is not an ideal candidate for surgery because the gun shot would destroyed the muscle mass in his abdomen, and thus there is nothing in that area that could be repaired in order to provide Farmer with additional support.  (*Id.* ¶ 92; Doc. 23-10 at 36 ¶ 70, Hendershot Decl).  At this time, Hubble ordered a complete blood count and a test for Farmer's lipids level and prescribed Elavil, Hydrochlorothiazide, and Naproxen.  (Doc. 24 ¶ 93).

On September 21, 2007, Farmer saw PA Hubble during sick call at which time he complained that the Naproxen no longer was providing him with relief and describing the pain as gnawing to sharp, and relieved by sitting or lying down.  (*Id.* ¶

94).  Hubble discontinued the Naproxen and instead prescribed Motrin.  (*Id.*).

On September 26, 2007, Farmer asked PA Hubble for another abdominal binder, and Hubble agreed that he should receive the binder.  (*Id.* ¶ 95).  On October 10, 2007, Farmer told Hubble that the binder did not provide sufficient support.  (*Id.* ¶ 96).  At that time, Hubble explained to Farmer why he is not an ideal candidate for surgery.  (*Id.*).  On October 25, 2007, Farmer was released on parole.  (*Id.* ¶ 97).

### 4. Facts Relating to Lack of Personal Involvement by Defendants Holt, Ong, and Prantow

Defendant Holt currently is the warden at the United States Penitentiary at Canaan ("USP Canaan") in Waymart, Pennsylvania.  (*Id.* ¶ 176).  At the times alleged in Farmer's Complaint, Holt was employed as the warden at FCI Schuylkill.  (*Id.* ¶ 177).  As warden, Holt is responsible for the overall orderly operation of the institution.  (*Id.* ¶ 178).  Holt had no involvement in any of Farmer's allegations. (*Id.* ¶ 179).

Defendant Ong currently is employed as the Health Services Administrator ("HSA") at the Federal Correctional Complex in Petersburg, Virginia ("FCC Petersburg").  (*Id.* ¶ 180).  At the times alleged in Farmer's Complaint, Ong was employed as the HSA at FCI Schuylkill.  (*Id.* ¶ 181).  As the HSA, Ong is responsible for managing and directing the activities of a multi-disciplinary team of health care

professionals who are responsible for medical, dental, and allied health services (pharmacy, lab, and x-ray) to the inmate population.  (*Id.* ¶ 182).  While Ong is a medical doctor, he did not have clinical privileges at FCI Schuylkill and did not render medical advice or care to the inmate population.  (*Id.* ¶ 183).

Ong also served as the Duty Officer at FCI Scuylkill.  (*Id.* ¶ 184).  As active Duty Officer, Ong would have had no involvement in escorting Farmer to an outside hospital.  (*Id.* ¶ 185).  The Duty Officer only is involved in transporting an inmate to an outside hospital when a medical life-threatening emergency arises.  (*Id.* ¶ 186).  In a non-life threatening situation such as the one where Farmer allegedly fell from his top bunk, the operations lieutenant would contact the medical staff member who was on call and medical staff would determine if the inmate should be sent to the outside hospital.  (*Id.* ¶ 187).  The Duty Officer only would be involved in that he would be notified by the operations lieutenant and then be responsible for reporting the incident to the appropriate officials in the chain of command.  (*Id.* ¶ 188).  Ong, in his capacity as HSA and Duty Officer at FCI Schuylkill, had no involvement in any of Farmer's allegations.  (*Id.* ¶ 189).

As Unit Manager, Defendant Prantow is responsible for directing and managing a housing unit within a federal correctional institution and for the total administration

of the unit, as well as the planning, development, and implementation of individual

programs tailored to meet the particular needs of inmates in the unit.  (*Id.* ¶ 190).

Prantow did not assign bunks or jobs to inmates in his capacity as a Unit Manager.  (*Id.*

¶ 191).  Prantow had no involvement in any of Farmer's allegations.  (*Id.* ¶ 192).

### B.   Exhaustion of Administrative Remedies

#### 1.   *Bivens* Claims

Section 1997e(a) of Title 42 of the United States Code provides that "[n]o action

shall be brought with respect to prison conditions under section 1983 of this title, or

any other Federal law, by a prisoner confined in any jail, prison, or other correctional

facility until such administrative remedies as are available are exhausted."  This

"exhaustion requirement applies to all inmate suits about prison life, whether they

involve general circumstances or particular episodes, and whether they allege

excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  A

prisoner must exhaust all available administrative remedies before initiating a federal

lawsuit.  *Booth v. Churner*, 532 U.S. 731, 739 (2001).  Failure to exhaust available

administrative remedies is an affirmative defense.  *Ray v. Kertes*, 285 F.3d 287, 295

(3d Cir. 2002).  As such, the failure to exhaust available administrative remedies must

be pleaded and proven by the Defendants.  *Brown v. Croak*, 312 F.3d 109, 111 (3d Cir.

2002).

Defendants have properly raised the matter of exhaustion of administrative remedies made available to inmates confined within the BOP.  The BOP Administrative Remedy Program is described at 28 C.F.R. Part 542.  The purpose of the program "is to allow an inmate to seek formal review of an issue relating to any aspect of his/her own confinement."  28 C.F.R. § 542.10(a).  Inmates first must informally present their complaints to staff, and staff shall attempt to informally resolve any issue before an inmate files a request for administrative relief.  28 C.F.R. § 542.13(a).  If unsuccessful at informal resolution, the inmate may raise his complaint with the warden of the institution where he is confined.  *Id.* at § 542.14(a).  If dissatisfied with the response, the inmate then may appeal an adverse decision to the Regional Office and the Central Office of the BOP.  *Id.* at § 542.15(a).

Defendants have presented computerized records of Farmer's pursuit of administrative remedies while incarcerated at FCI Schuylkill.  The undisputed facts establish the following with regard to Farmer's filing of administrative remedies that have not been exhausted:

While in the custody of the BOP, Farmer filed sixteen (16) administrative remedies.  (Doc. 24 ¶ 121).  Farmer failed to exhaust his available administrative

remedies regarding his claims of retaliation, transfer to an outside hospital after his alleged fall from the top bunk, and the treatment of his abdominal hernia.  (*Id.* ¶ 120).

With regard to his claim that staff retaliated against him for complaining about the May 27, 2006 incident by filing a false incident report against him, (*see* Doc. 1 at 10, 19), Farmer did not exhaust his two administrative remedies asserting this claim. On August 15, 2006, Farmer filed an administrative remedy appealing a July 24, 2006 Disciplinary Hearing Officer ("DHO") hearing for a code 108 violation. (*Id.* ¶ 126).  In that remedy, Farmer alleged that (1) the charges were fabricated in retaliation for a lawsuit he was filing against staff; (2) the DHO was aware that the charges were fabricated and, in order to protect Farmer, the DHO expunged the code 104 charge; (3) the DHO found another inmate responsible for the contraband found in his cubicle; and (4) his legal mail was being opened out of his presence in violation of his civil rights. (*Id.* ¶ 127).  On September 14, 2006, Farmer's administrative remedy was granted in part.  (*Id.* ¶ 128).  Specifically, the Regional Director noted that a review of Farmer's appeal revealed some questions as to the specific evidence used to determine that Farmer committed the prohibited act.  (*Id.* ¶ 129).  The incident report was remanded back to the DHO for further clarification and amendment.  (*Id.* ¶ 130).

The DHO then held a re-hearing on January 22, 2007 after which Farmer was

found guilty of the charge of Possession, Manufacture, or Introduction of a Hazardous

Tool, in violation of code 108A.  (*Id.* ¶ 114).  On February 12, 2007, Farmer filed an

administrative remedy with staff at the BOP Northeast Regional Office appealing the

rehearing.  (*Id.* ¶ 161).  In his appeal, Farmer again alleged that the DHO charge was

fabricated in retaliation for a civil action he was filing and that the DHO was aware

that the charges were false.  (*Id.* ¶ 162).  He also alleged that he could not be found

liable for the contraband because it was found in the common area rather than his

locker.  (*Id.*).  On March 13, 2007, BOP Regional staff denied Farmer's appeal.  (*Id.* ¶

163).  However, Farmer did not appeal from the BOP Regional Office's decision to the

BOP Central Office, and thus, he did not exhaust his retaliation claim.  *See* 28 C.F.R. §

542.15.

 As to Farmer's claim that he was not properly transferred to an outside hospital

after his alleged fall from a top bunk on May 27, 2006, (*see* Doc. 1 at 8-9, 11), the

undisputed facts reflect that he did not file any administrative remedies regarding this

issue.  (*See* Doc. 24 ¶¶ 117-170).

 Finally, as to Farmer's claim that staff failed to provide him with adequate

treatment for his sixty (60) pound hernia, (*see* Doc. 1 at 9, 18), Farmer did not exhaust

his administrative remedies with regard to this claim until December 3, 2007, which

was after the filing of this action.  (*See* Doc. 24 ¶¶ 164-170).  In *Oriakhi v. United States*, 165 Fed. Appx. 991, 993 (3d Cir. 2006), the Third Circuit Court of Appeals found that the exhaustion requirement is not satisfied if the inmate files an action in the district court prior to completing the administrative remedy process.  *See also Ahmed v. Dragovich*, 297 F.3d 201, 209 & n.9 (3d Cir. 2002).  Accordingly, Farmer failed to exhaust his administrative remedies regarding the treatment he received for his abdominal hernia.

The undisputed facts establish that Farmer successfully exhausted his *Bivens* claims regarding his designation to an upper bunk and the medical treatment of his injuries associated with his alleged fall on May 27, 2006, (*see* Doc. 1 at 7-18), by filing the following administrative remedies:

On September 28, 2006, Farmer filed administrative remedy number 427812-F2 with staff at FCI Schuylkill alleging (1) a breach of fiduciary duty by Defendant Talamantes in moving Farmer from a bottom to a top bunk despite his medical restrictions due to his hernia and (2) inadequate medical care after his May 27, 2006 fall from a top bunk.  (Doc. 24 ¶ 137; Doc. 23-9 at 33, 9/28/06 Request for Administrative Relief).  On October 13, 2006, staff denied administrative remedy number 427812-F2 after a review of Farmer's medical record revealed that he had a

medical pass for a lower bunk through June 12, 2007 and had received adequate medical care.  (Doc. 24 ¶ 143; Doc. 23-9 at 35, 10/13/06 Response).

On October 26, 2006, Farmer filed administrative remedy number 427812-R1 with staff at the BOP Northeast Regional Office alleging (1) a breach of fiduciary duty by Defendant Talamantes in moving Farmer from a bottom to a top bunk despite his medical restrictions due to his hernia and (2) inadequate medical care after his May 27, 2006 fall from a top bunk.  (Doc. 24 ¶ 146; Doc. 23-9 at 37, 10/26/06 Regional Administrative Remedy Appeal).  On November 21, 2006, the Regional Director denied Farmer's administrative remedy after a review of the appeal revealed that Farmer had a medical duty slip for a lower bunk and was receiving adequate medical care.  (Doc. 24 ¶ 154; Doc. 23-9 at 44, 11/21/06 Response).

On December 7, 2006, Farmer filed administrative remedy number 427812-A1 with staff at the BOP Central Office alleging (1) a breach of fiduciary duty by Defendant Talamantes in moving Farmer from a bottom to a top bunk despite his medical restrictions due to his hernia and (2) inadequate medical care after his May 27, 2006 fall from a top bunk.  (Doc. 24 ¶ 158; Doc. 23-9 at 48, 12/7/06 Central Office Administrative Remedy Appeal).  On January 26, 2007, Central Office staff denied Farmer's administrative remedy after a review of the appeal revealed that FCI

29

Schuylkill staff had issued a lower bunk pass and Farmer had received adequate medical care.  (Doc. 24 ¶ 160; Doc. 23-9 at 52, 1/26/07 Response).  Consequently, Farmer has successfully exhausted his *Bivens* claims regarding his designation to an upper bunk and the medical treatment of his injuries associated with his alleged fall on May 27, 2006.

### 2.   Tort Claim

The FTCA, 28 U.S.C. § 2671 *et seq.*, is a statutory waiver of sovereign immunity for tort claims.  *Gotha v. United States*, 115 F.3d 176, 179 (3d Cir. 1997). The FTCA allows the government to be sued "in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 2674.  However, as the FTCA is an express waiver of sovereign immunity, strict compliance with its provisions is required.  *Livera v. First Nat'l Bank*, 879 F.2d 1186, 1194 (3d Cir. 1989).

As a prerequisite to a suit under the FTCA, a claim first must be presented to, and denied by, the federal agency.  The FTCA provides:

> An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury . . . unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.

28 U.S.C. § 2675(a).  In the instant case, on October 27, 2006, the BOP Northeast

Regional Office received Farmer's administrative tort claim in which he alleges that staff retaliated against him for complaining about his job status by placing him in a top bunk, even though he was restricted to a lower bunk.  (Doc. 24 ¶ 173).  Farmer further alleges that, as a result of being placed in the top bunk, he fell and injured his head. (*Id.* ¶ 174.; Doc. 23-9 at 72, Administrative Tort Claim).  On April 25, 2007, Farmer's administrative tort claim was denied.  (Doc. 24 ¶ 175).  Defendants therefore concede that Farmer exhausted his administrative remedies regarding his FTCA claim of negligence in being assigned to a top bunk.  The undisputed facts establish that Farmer's administrative tort claim did not contain any allegations regarding Farmer's transfer to the hospital after the alleged fall or treatment of his abdominal hernia.  (*Id.* ¶ 174; Doc. 23-9 at 72).  Therefore, he did not exhaust these FTCA claims.  The Court now will analyze the claims Farmer successfully has exhausted.

### C.   Deliberate Indifference Claims

#### 1.   Defendants Hendershot, Chaw, Hubble, and Kabonick

Farmer successfully exhausted his claim regarding the treatment he received for his injuries after his alleged fall on May 27, 2006.  In order to establish an Eighth Amendment claim against a defendant for inadequate medical care, a plaintiff must show "(i) a serious medical need, and (ii) acts or omissions . . . that indicate deliberate

indifference to that need." *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 582

(3d Cir. 2003).  *See also Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).  A

serious medical need is one that has been diagnosed by a physician as requiring

treatment, or one that is so obvious that a layperson would recognize the need for a

doctor's attention.  *Monmouth County Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326,

347 (3d Cir. 1987).  In addition, "if 'unnecessary and wanton infliction of pain' results

as a consequence of denial or delay in the provision of adequate medical care, the

medical need is of the serious nature contemplated by the eighth amendment."  *Id.*

(quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).

The test for whether a prison official was deliberately indifferent is whether that

defendant "acted or failed to act despite his knowledge of a substantial risk of serious

harm."  *Farmer v. Brennan*, 511 U.S. 825, 841 (1994).  "The official must both be

aware of facts from which the inference can be drawn that a substantial risk of serious

harm exists, and he must also draw the inference."  *Id.* at 837.  Thus, a complaint that a

physician "has been negligent in diagnosing or treating a medical condition does not

state a valid claim of medical mistreatment under the Eighth Amendment . . . ."

*Estelle*, 429 U.S. at 106.

In this case, the undisputed factual record establishes that Defendants

Hendershot, Chaw, Hubble, and Kabonick are entitled to judgment as a matter of law as to Farmer's claims regarding the medical care he received after his alleged fall on May 27, 2006.  The record reflects that Defendants Chaw and Kabonick did not see Farmer after May 27, 2006, but rather provided medical treatment for him before his fall.  (*See* Doc. 24 ¶¶ 24, 25, 27, 28, 31, 44, Undisputed Facts Regarding Farmer's Visits with Dr. Chaw; Doc. 24 ¶ 39, Undisputed Facts Regarding Farmer's Visit with EMT Kabonick).  While Dr. Chaw and EMT Kabonick provided medical treatment to Farmer for his hernia, Farmer did not exhaust his claims related to this treatment. Therefore, because Chaw and Kabonick have no personal involvement in Farmer's allegations regarding the treatment he received after his alleged fall, they cannot be held liable, *see Rode*, 845 F.2d at 1207, and are entitled to judgment as a matter of law.

With regard to Defendant Hendershot, the undisputed factual record reflects that he saw Farmer on one occasion after the fall.  (*See* Doc. 24 ¶¶ 67-72).  At that June 2, 2006 visit, Dr. Hendershot noted that Farmer ambulated with difficulty, x-rays of his back and neck were normal, and he was once again not wearing the abdominal binder he had been provided.  (*See id.* ¶ 68).  After diagnosing Farmer with post-concussion syndrome, Dr. Hendershot placed Farmer on convalescent status until June 12, 2006, thereby excusing him from work, and prescribed Naproxen for pain.  (*Id.* ¶ 70).  He

also reissued Farmer another Convalescent Work Change form restricting Farmer to a bottom bunk through June 12, 2006.  (*Id.* ¶ 72).  Based on this record, there is no evidence that Dr. Hendershot acted with deliberate indifference toward Farmer's serious medical needs, and Dr. Hendershot is entitled to judgment as a matter of law.

As to Defendant Hubble, the undisputed factual record reflects that he provided medical treatment to Farmer on nine (9) occasions in the time period following Farmer's May 27, 2006 fall until his release on October 25, 2007.  (*See* Doc. 24 ¶¶ 78-97).  The record reflects that Hubble performed a physical evaluation of Farmer on each of these occasions and provided treatment accordingly.  (*See id*).  As such, there is no evidence that PA Hubble acted with deliberate indifference toward Farmer's serious medical needs, and PA Hubble is entitled to judgment as a matter of law.

## 2.    Defendant Talamantes

Farmer successfully exhausted his claim that Defendant Talamantes assigned him to a top bunk in violation of the Eighth Amendment.  "The Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones."  *Farmer*, 511 U.S. at 832 (citing *Rhodes v. Chapman*, 542 U.S. 337, 349 (1981)).  The Eighth Amendment prohibition against cruel and unusual punishment requires that prison officials provide "humane conditions of confinement" including "adequate food,

clothing, shelter and medical care." *Farmer*, 511 U.S. at 832.

"[T]o establish an Eighth Amendment violation an inmate must allege both an objective element- that the deprivation was sufficiently serious-and a subjective element- that a prison official acted with a sufficiently culpable state of mind, *i.e.,* deliberate indifference." *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996) (citing *Wilson v. Seiter,* 501 U.S. 294 (1991)). "The objective inquiry is whether the inmate was 'denied the minimal civilized measure of life's necessities.'" *Fuentes v. Wagner,* 206 F.3d 335, 345 (3d Cir. 2000) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)). To satisfy the subjective component, an inmate must prove that a prison official demonstrated "deliberate indifference" to a serious risk of harm to which the inmate was exposed. *Farmer,* 511 U.S. at 836-37. "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

The undisputed factual record establishes that Defendant Talamantes was not aware of any excessive risk to Farmer's health or safety. Talamantes performed two

searches of the roster, and neither search revealed that Farmer had a lower bunk restriction.  (*See* Doc. 24 ¶¶ 51, 54).  Moreover, after Talamantes gave Farmer an opportunity to provide a copy of the lower bunk restriction that would have been provided to him after it was issued, (*see id.* ¶ 4), Farmer did not provide Talamantes with any further information, and thus Talamantes had no reason to believe that Farmer's assignment to an upper bunk posed any risk to Farmer's safety.  (*See id.* ¶ 55).  Further, Talamantes advised Farmer that if he believed he required a lower bunk, he should report to Health Services the next day to take care of the issue.  (*See id.* ¶ 56).  No evidence exists that Defendant Talamantes acted with deliberate indifference in temporarily assigning Farmer to an upper bunk, and therefore, Talamantes is entitled to judgment as a matter of law.

### D.    FTCA Claim

In his FTCA claim, Farmer alleges that Defendant Talamantes retaliated against him for complaining about his job status by placing him in a top bunk, even though he was medically restricted to a lower bunk.[6]  (Doc. 24 ¶ 173).  He alleges that, as a result

---

[6]While Farmer asserted his FTCA claim against Defendant Talamantes, the Court notes that a claim filed pursuant to the FTCA must be brought against the United States itself, rather than against its agents or employees.  28 U.S.C. § 2679(b)(1); *see also Banks v. Roberts*, 251 Fed. Appx. 774, 777 (3d Cir. 2007); *Durosky v. United States*, No. 07-1828, 2008 WL 521204, at *1 n. 1 (M.D. Pa. Feb. 27, 2008).  Therefore, Defendant Talamantes cannot be held liable under the FTCA.  However, in the interest of justice to this *pro se* litigant, *see Haines v. Kerner*, 404 U.S. 519, 520-21

(continued...)

of Talamantes' negligence in assigning him to a top bunk, he fell and injured his head.

(*Id.* ¶ 174; Doc. 23-9 at 72, Administrative Tort Claim).

The Federal Tort claims Act confers subject matter jurisdiction on district courts

over negligence actions against the United States.  It provides, in relevant part, as

follows:

> . . . the district courts . . . shall have exclusive jurisdiction of civil actions
> on claims against the United States, for money damages . . . caused by the
> negligent or wrongful act or omission of any employee of the Government
> while acting within the scope of his office or employment, under
> circumstances where the United States, if a private person, would be liable
> to the claimant in accordance with the law of the place where the act or
> omission occurred.

28 U.S.C. § 1346(b)(1).  It is well-settled that, in considering a FTCA action, a federal

district court must apply the law of the state in which the alleged tortious conduct

occurred.  *Id.*; *Turner v. Miller*, 679 F. Supp. 441, 443 (M.D. Pa. 1987).  To establish a

cause of action for negligence in Pennsylvania, a plaintiff must prove the following

---

[6](...continued)
(1972), the Court will construe his negligence claims against Defendant Talamantes as claims
brought against the United States pursuant to the FTCA.  *See Martinez v. United States Post Office*,
875 F. Supp. 1067, 1074 (D.N.J. 1995) ("The United States is the only proper defendant in a suit for
personal injuries arising out of the negligence of Federal employees.").

   Moreover, because Farmer cannot assert an FTCA claim against Defendant Talamantes, his
claim that Defendant Talamantes retaliated against him for complaining about his job status by
assigning him to a lower bunk was not properly raised within his FTCA claim, but could only
properly have been raised as a *Bivens* claim.  The record reflects that Farmer neither filed
administrative remedies asserting a retaliation claim against Talamantes nor raised it in his
Complaint.

elements: (1) a duty or obligation recognized by law; (2) a breach of that duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual damages. *Northwest Mutual Life Ins. Co. v. Babayan*, 430 F.3d 121, 139 (3d Cir. 2005); *Pittsburgh Nat'l Bank v. Perr*, 637 A.2d 334, 336 (Pa. Super. Ct. 1994). Further, under Pennsylvania law, a plaintiff is required to show that the defendant's negligence was the proximate cause of his injury by a preponderance of the evidence. *See Baum v. United States*, 541 F. Supp. 1349, 1351 (M.D. Pa. 1982) (Herman, J.). Pennsylvania law defines proximate cause as causation which was a substantial factor in bringing about the injury. *See Hamil v. Bashline*, 392 A.2d 1280, 1284 (1978).

The government's duty of care to federal prisoners is one of ordinary diligence, meaning that the United States must "exercise reasonable care and diligence to protect the prisoner from danger, known to or which might reasonably be apprehended by him." 18 U.S.C. § 4042; *See also Turner*, 679 F. Supp. at 443 (quoting *Hossic v. United States*, 682 F. Supp. 23, 25 (M.D. Pa. 1987)). Farmer has not presented any evidence that BOP staff breached their duty. Rather, the undisputed factual record establishes that BOP staff exercised ordinary diligence in assigning Farmer's bunk. On March 3, 2006, BOP staff exercised ordinary diligence in issuing Farmer a lower bunk restriction, effective until March 3, 2007. (*See* Doc. 24 ¶ 39). While it appears that

staff may not have loaded the lower bunk restriction into SENTRY as it normally would do, (*see id.* ¶ 3), the BOP exercised ordinary diligence in providing a copy of the restriction to Farmer for his own records (*see id.* ¶ 4).  The BOP policy of providing copies of medical restrictions to inmates is a safeguard for situations like the one that occurred in this case where, for whatever reason, a record of an inmate's medical restriction is not available through the SENTRY system.  Accordingly, there is no evidence that the United States breached its duty of ordinary diligence where it provided a copy of the lower bunk restriction to Farmer for his records.[7]

### E.    Defendants Holt, Ong, and Prantow

"A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*."  *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (citations omitted); *see also Parker v. U.S.*, 197 Fed. Appx. 171, 172 (3d Cir. 2006) (stating that "liability under *Bivens* . . . may not [be] based on the doctrine of *respondeat superior*").  The personal involvement requirement may be satisfied by a showing of

---

[7]Even if staff's failure to load Farmer's lower bunk restriction into SENTRY constituted negligence, Farmer has failed to offer any evidence that this failure was the proximate cause of the injuries he suffered.  *See Baum*, 541 F. Supp. at 1351.  Specifically, Farmer has failed to offer evidence that staff's failure to load his lower bunk restriction into the SENTRY system was a substantial factor in bringing about his injury.  *See Hamil*, 392 A.2d at 1284.

"personal direction or of actual knowledge and acquiescence." *Rode*, 845 F.2d at 1207.

In the instant case, the undisputed factual record establishes that Defendants Holt, Ong, and Prantow were named as Defendants solely based upon their supervisory roles as warden, health services administrator, and unit manager, respectively, and had no personal involvement in any of Farmer's allegations. (*See* Doc. 24 ¶¶ 176-192). Therefore, these Defendants cannot be held liable and are entitled to judgment as a matter of law.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment will be granted. An appropriate Order shall enter on today's date.